1  MICHAEL J. MCCUE (SBN: 296425)
   Email: MMcCue@LRRC.com
2  AARON D. JOHNSON (SBN: 261747)
   Email: ADJohnson@LRRC.com
3  4300 Bohannon Drive, Suite 230
   Menlo Park, California 94025
4  (650) 391-1380 (Tel.)
   (650) 391-1395 (Fax)
5
6  *Attorneys for Plaintiff*
   *NNG, Kft.*

**SEALED BY ORDER OF THE COURT**

ADR   FILED

APR 15 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NNG, Kft., a Hungarian corporation,<br><br>  Plaintiff,<br><br>vs.<br><br>Giles D. Shrimpton, an individual<br><br>  Defendant. | Case No: **CV 19 2029 SVK**<br><br>**PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER, FOR AN ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION, AND FOR A MOTION FOR PRELIMINARY INJUNCTION, AND POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**Hearing Date:**<br>**Hearing Time:** |

Plaintiff NNG, Kft. ("NNG" or "Plaintiff") respectfully seeks an *ex parte* temporary restraining order to enjoin Defendant Giles Shrimpton, NNG's former CEO, from copying, using or disclosing NNG's trade secrets and an order requiring Apple Inc. to lock access to Mr. Shrimpton's iCloud account. Two days after being asked to tender his resignation, Mr. Shrimpton spent a Sunday afternoon forwarding approximately 268 internal NNG emails, including nearly 200 attachments, containing NNG's trade secrets to Shrimpton's personal iCloud email account. The only way that NNG may be able to prevent further dissemination of NNG's trade secrets and the resulting irreparable injury that NNG would suffer as a result is an order locking Mr. Shrimpton's iCloud account until this matter can be heard.

-1-

Given Mr. Shrimpton's brazen unlawful conduct, NNG seeks this temporary restraining order on an *ex parte* basis because providing Mr. Shrimpton with notice of this action would enable him to access, download, and secure copies of the trade secrets that he has stored in iCloud. Furthermore, since Mr. Shrimpton is a foreign individual and given the extent of his unlawful conduct, he is not likely to obey any order of the Court when there is no effective means by which Mr. Shrimpton can be held in contempt. NNG's only hope of obtaining effective relief is to obtain this order on an *ex parte* basis

## STATEMENT OF FACTS

NNG is a world leader in the development of navigation and infotainment software for automotive, wireless, and personal navigation systems. (*See* Declaration of Peter Szombathelyi ("Szombathelyi Decl.") ¶ 2.) NNG software has been shipped in more than 20 million devices globally. (*Id.*) NNG has licensed its software to more than 150 hardware manufacturers worldwide. (*Id.*) NNG's software has been licensed to the top automotive manufacturers in the world, including Chrysler, Ferrari, Fiat, Ford, Honda, Kia, Mazda, McLaren, Nissan, Porsche, Subaru, Toyota, Volkswagen, and Volvo. (*Id.*) NNG's flagship product is the award-winning "iGo Primo" navigation software. (*Id.*) NNG operates a global business with offices in Asia, Israel, Europe and the United States. (*Id.*) NNG employs more than 800 individuals. (*Id.*)

NNG's core assets are its confidential and proprietary software, technology and knowhow, as well as its business relationships with OEMs, automobile makers, and others, which it has developed over its 15 year history. (Szombathelyi Decl. ¶ 3.)

NNG has developed a substantial amount of confidential and proprietary information including, without limitation software, technology, knowhow, pricing strategies, marketing strategies, customers lists and contacts, and the like (collectively, "Confidential Information"). (Szombathelyi Decl. ¶ 4.)

NNG has used reasonable measures to protect its Confidential Information, including by restricting access to such information to employees on a need to know basis, using physical security to restrict access to its offices, using software to restrict access to NNG's computer

-2-

systems and data to authorized individuals, and utilizing company-wide policies and employment agreements restricting disclosure and use of such Confidential Information. (Szombathelyi Decl. ¶ 5.)

NNG's Confidential Information has independent economic value because it is not generally known to and not readily ascertainable by others through proper means. (Szombathelyi Decl. ¶ 6.)

On or about June 16, 2016, NNG hired Defendant Shrimpton to act as its Chief Executive Officer. (Szombathelyi Decl. ¶ 7.) In connection with his employment, Shrimpton agreed to, among other things, maintain all information and data related to NNG and the activities of NNG which he learned through his employment as trade secrets of NNG, including, but was not limited to, technology, products, business and financial information, which are within the scope of the Confidential Information as defined above. (*Id.*) Shrimpton further agreed that during and after his employment with NNG, he would not disclose these secrets to any unauthorized third parties. (*Id.*)

On Friday, April 5, 2019, NNG asked Shrimpton to tender his resignation. (Szombathelyi Decl. ¶ 8.)

On Sunday, April 7, 2019, without NNG's knowledge or consent, Shrimpton spent approximately 3.5 hours forwarding emails and attachments from his email account at NNG to his personal email account hosted by Apple's iCloud service. (Szombathelyi Decl. ¶ 9.) During that time period, Shrimpton sent approximately 268 emails including nearly 200 attachments, such as slide decks and Excel spreadsheets, to his iCloud email address. (*Id.*) These emails and attachments contained a broad range of NNG's Confidential Information, including, for example: (a) NNG's business information regarding customers, vendors, business partners, including proposals, projects and strategies; (b) NNG's business model for its user experience ("UX") products; (c) NNG's long term business plans; (d) internal management presentations; (e) NNG's financial information, including sales, budgets, costs and forecasts; (f) licensing strategies and terms; (g) patent-related information; (h) employee information, including

-3-

104784350_1

compensation; (i) privileged information, including that involving potential litigation; (j) product-related information concerning quality processes and customer claims; and (k) information relating to the planned M&A of the company itself, including company valuation and, transaction proposals (third party business secrets). (*Id.*)

On Monday and Tuesday, April 8 and 9, 2019, NNG and Shrimpton completed the legal paperwork for his departure. (Szombathelyi Decl. ¶ 10.) His last day at NNG was April 9, 2019. (*Id.*)

On April 11, 2019, NNG learned of Shrimpton's Sunday afternoon mass emailing of NNG's Confidential Information, including documents, to Shrimpton's personal iCloud email address. (Szombathelyi Decl. ¶ 11.) NNG immediately contacted legal counsel in the United States to seek emergency relief to prevent Shrimpton from assessing, disclosing or using the Confidential Information. (*Id.*)

Disclosure or use of such Confidential Information is likely to cause NNG to suffer irreparable injury. (Szombathelyi Decl. ¶ 12.) The information can be used by Shrimpton himself or improperly disclosed to NNG's competitors enabling them to gain a competitive advantage regarding NNG's strategies, pricing, customer projects, and the like. (*Id.*)

## ARGUMENT

Rule 65 governs the issuance of temporary restraining orders and preliminary injunctions. Furthermore, the Defend Trade Secrets Act specifically provides that the Court may enter an injunction as a remedy to prevent any actual or threatened misappropriation and to take "affirmative actions" to protect the trade secrets. 18 U.S.C. § 1836(3)

To obtain a temporary restraining order or preliminary injunction, a plaintiff must establish that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008); *see* Fed. R. Civ. P. 65. The Ninth Circuit may analyze these four elements using a "sliding scale" approach, in which "the elements of the preliminary injunction test are balanced, so that a

stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

## I. NNG IS LIKELY TO SUCCEED ON THE MERITS OF ITS DEFEND TRADE SECRETS ACT CLAIM

An owner of a trade secret that is misappropriated may bring a civil action for violation of the Defend Trade Secrets Act of 2016 if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce. 18 U.S.C. § 1836.

### A. The Information Defendant Took Are Trade Secrets

A "trade secret" is any form or type of financial, business, scientific, technical, economic, or engineering information which (1) the owner thereof has taken reasonable measures to keep secret; and (2) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means. 18 U.S.C. § 1839.

As discussed above, the emails and attachments that Shrimpton emailed from his NNG account to his personal iCloud account contained a broad range of NNG's confidential information, including, for example, NNG's business information regarding customers, vendors, business partners, including proposals, projects and strategies NNG's long-term business plans; internal management presentations; product-related information; NNG's financial information, and the like. (Szombathelyi Decl. ¶ 9.) These materials are all clearly confidential – in fact, some of the emails are designated as "CONFIDENTIAL (!)" in their titles. This information is not general known to others outside of NNG through proper means. Indeed, NNG is a privately held company. The information has economic value to NNG and to others. It can and can easily be used by Mr. Shrimpton or NNG competitors to compete with NNG, to provide pricing and strategic assistance, to enable them to undercut NNG's pricing and try to jump ahead of NNG in the marketplace. (Szombathelyi Decl. ¶ 12.)

NNG has used reasonable measures to protect its confidential information, including by restricting access to such information to employees on a need to know basis, using physical

security to restrict access to its offices, using software to restrict access to NNG's computer systems and data to authorized individuals, and utilizing company-wide policies and employment agreements restricting disclosure and use of such Confidential Information. (Szombathelyi Decl. ¶ 5.) Indeed, Shrimpton signed such an employment agreement and then signed another affirmation that he would maintain NNG's trade secrets upon departure from his employment. (Szombathelyi Decl. ¶¶ 7, 13.)

### B. Shrimpton Misappropriated NNG's Trade Secrets

Misappropriation includes "disclosure or use of a trade secret of another without express or implied consent" by a person who knew or had reason to know that the knowledge of the trade secret was "acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(b).

Here, Shrimpton misappropriated NNG's trade secrets by disclosing NNG's trade secrets via transmission to a personal email account. As the CEO of NNG, Shrimpton knew that he acquired his knowledge of NNG's trade secrets under circumstances giving rise to a duty to maintain the secrecy of the information and limit the use. By using email, he further engaged in espionage through electronic means.

Furthermore, given the timing and extent of Shrimpton's conduct, it was clearly a calculated and intentional act by a departing officer of the company.

### C. Shrimpton is Subject To Jurisdiction in the U.S. And His Conduct Is Subject To The Trade Secrets Act

The Federal Trade Secrets Act applies to conduct that occurs outside the United States if there was an "act in furtherance of the offense" committed in the United States." 18 U.S.C. § 1837. Here, Shrimpton emailed the trade secrets to his personal iCloud account, which is hosted by Apple. By using the United States as his haven for storing the stolen information, Shrimpton committed an act in furtherance of his offense in the United States.

Furthermore, by employing a United States company's servers to further his wrongdoing, Defendant subjected himself to personal jurisdiction here. *See MacDermid, Inc.*

104784350_1

*v. Deiter*, 702 F.3d 725, 728-31 (2d Cir. 2012) (holding that there is personal jurisdiction over defendant for violation of state trade secrets act where defendant interacted with computers in Canada but used email servers located in Connecticut to misappropriate trade secrets, and thus, satisfied both Connecticut's long-arm statute and Due Process Clause of the Fourteenth Amendment); *Verizon Online Servs. V. Ralsky*, 203 F. Supp. 2d 601, 610 (E.D. Va. 2002) (holding that Defendants' transmitting of emails through Verizon's servers in Virginia was sufficient to establish personal jurisdiction where "[t]he use of Verizon's e-mail servers was an integral component of the" underlying misconduct").

Finally, given that the servers that host and store the email accounts containing the trade secrets at issue are controlled by Apple, which is located in this district, the Court has personal jurisdiction over at least the property at issue. Fed. R. Civ. P. 4(n); *United States v. All Assets Listed in Attachment A*, 89 F. Supp. 3d 813, 823 (E.D. Va. 2015) ("The claimants allegedly reproduced and stored infringing files on these servers and caused communications to be sent from servers in Virginia indicating that infringing files had been removed…Therefore, the court finds that alleged acts in furtherance of the conspiracy to commit copyright infringement occurred within this judicial district… Accordingly, there are minimum contacts between this jurisdiction and the defendant assets, and this court has *in rem* jurisdiction over the assets…"), *aff'd sub nom. United States v. Batato*, 833 F.3d 413 (4th Cir. 2016).

## II. NNG WILL SUFFER IRREPARABLE HARM IF THE TRO AND PRELIMINARY INJUNCTION ARE NOT GRANTED

"[C]ourts in this district have presumed that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated." *Comet Techs. United States of Am. Inc. v. Beuerman*, No. 18-CV-01441-LHK, 2018 WL 1990226, at *5 (N.D. Cal. Mar. 15, 2018) (all internal quotes and citations omitted); *see also W. Directories, Inc. v. Golden Guide Directories, Inc.*, 2009 WL 1625945, at *6 (N.D. Cal. 2009) ("The Court presumes that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated"); *TMX Funding, Inc. v. Impero Techs., Inc.*, 2010 WL 1028254, at *8 (N.D. Cal. 2010) ("California

104784350_1

courts have presumed irreparable harm when proprietary information is misappropriated."). Thus, the fact that NNG is likely to prevail on its trade secret misappropriation claims supports a finding of irreparable harm.

Even without the presumption, NNG has shown that irreparable injury is likely. A company has a legitimate interest in protecting its confidential company documents. *Winston Research Corp. v. Minnesota Min. & Mfg. Co.*, 350 F.2d 134, 138 (9th Cir. 1965) ("Unless protection is given against unauthorized disclosure of confidential business information by employees, employee-employer relationships will be demoralized"); *Lillge v. Verity*, 2007 WL 2900568, at *7 (N.D. Cal. 2007) ("[T]he risk of losing established customers to defendants' new business due to defendants' improper use of plaintiff's proprietary information would obviously create lasting, irreparable harm."); *Enter. Leasing Co. of Phoenix v. Ehmke*, 197 Ariz. 144, 151, 3 P.3d 1064, 1071 (Ct. App. 1999) ("a business must be afforded protection against the wrongful appropriation of confidential information by an employee, not only to encourage innovation and invention, but also to establish fair business practices."). "Irreparable harm to an employer may also result where an employee has misappropriated trade secrets or confidential customer information, including pricing methods, customer lists and customer preferences." *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532–33 (S.D.N.Y. 2004).

Here, not granting the TRO and preliminary injunction will cause NNG severe irreparable injury. The information taken by Shrimpton contains highly sensitive business information that can be used to compete with NNG or to divulge personal information of NNG employees and NNG business partners.[1] (Szombathelyi Decl. ¶ 12.)

Moreover, NNG's request for injunctive relief merely seeks to preserve the status quo until the matter can be heard on the merits by preventing the further distribution of the trade

---

[1] Plaintiff's showing of irreparable harm at this stage is bolstered by its strong showing of a likelihood of success that Defendant misappropriated NNG's trade secrets. *Alliance*, 632 F.3d at 1131 ("the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.").

-8-

secrets. If the request is not granted, however, Shrimpton can simply copy, distribute, and disclose the trade secrets, causing further damage; or destroy, alter or hide evidence of his fraudulent behavior. In such events, NNG will have no relief whatsoever.

### III. THE BALANCE OF EQUITIES TIPS SHARPLY IN FAVOR OF NNG

The evidence demonstrates that the balance of equities weighs in favor of granting NNG's request for a TRO and preliminary injunction. NNG has a strong interest in and right to protect its proprietary company information and once that information is disclosed to others, it will be difficult or impossible to recover or stop use of the information.

In contrast, there is no burden on Shrimpton because NNG is merely seeking an order that restricts access to an email account that is filled with NNG's own emails and documents. Moreover, there is no hardship arising from prohibiting Shrimpton from accessing, using or distributing the information he took and was obligated to maintain in confidence. *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (not undue burden to enjoin "conduct that is already prohibited under the provisions of the Confidentiality and Non-Solicitation Agreement"); *Dish Network L.L.C. v. Ramirez,* No. 15–CV–04712–BLF, 2016 WL 3092184, at *7 (N.D.Cal. June 2, 2016) (balance of hardships tips in favor of plaintiff seeking injunction when it would "do no more than require Defendant to comply with federal and state...laws" (citation omitted)).

Moreover, to reduce any potential burden or hardship, NNG will seek expedited discovery to determine if, how and when the emails and documents were used, and once that information is deleted, secured by a third party or removed from the account, access to the account can be restored. NNG will further agree to have auto-forwarding of any new incoming emails to another email of Defendant's choosing, so that Shrimpton can continue receiving emails unrelated to this case.

-9-

## IV.     THE REQUESTED RELIEF IS IN THE PUBLIC INTEREST

The public interest "favors the protection of legitimate business interest and the discouragement of unfair competition." *Equus Computer Sys., Inc. v. N. Computer Sys., Inc.*, No. CIV. 01-657(DWF/AJB), 2002 WL 1634334, at *4 (D. Minn. July 22, 2002) (entering tailored injunctive relief where employees misappropriated lists for use with competitor). Additionally, "the public interest is served when defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with her employer." *Henry*, 191 F. Supp. 3d at 1078.

Here, the issuance of a TRO and preliminary injunction will serve public policy by prohibiting Shrimpton and anyone in active concert with him, from continuing to unlawfully possess and use NNG's trade secrets.

## V.     THE COURT SHOULD REQUIRE NO BOND OR ONLY A NOMINAL BOND

Since NNG is merely seeking to restrict Shrimpton's access to an account in which he transmitted NNG's own emails and confidential information, Shrimpton should not suffer any damages as the result of a TRO or injunction. As a result, NNG should not be required to post a bond (or any bond required should be minimal).

## VI.     THE TEMPORARY RESTRAINING ORDER SHOULD ISSUE WITHOUT NOTICE TO DEFENDANT

Federal Rule of Civil Procedure 65(b) specifies the conditions under which an *ex parte* restraining order may issue:

> (1) Issuing Without Notice. The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
>
>> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard on opposition; and

104784350_1

(B) the movant's attorney certifies in writing the efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b). Furthermore, Local Civil Rule 65-1(b) requires good cause to not provide notice of the motion for TRO to the opposing counsel or party.

The purpose of a temporary restraining order is to preserve the status quo of the parties and prevent irreparable harm pending a preliminary injunction hearing in the case. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). Temporary restraining orders can be granted without notice when immediate and irreparable injury would result. *Orange County Foundation for Medical Care v. Eakins*, No. SA CV 07-1035, 2007 U.S. Dist. LEXIS 83166 at *6 (C.D. Cal. 2007). *Ex parte* temporary restraining orders may be issued when the requirements of Rule 65 are met and the applicant "sufficiently demonstrates the reason that notice should not be required." *In re Vuitton et Fils S.A.*, 606 F.2d 1, 4 (2d Cir. 1979). Notice is not necessary if such notice would "render fruitless further prosecution of the action," which is contrary to the intent of Rule 65. *Id.* at *5.

Here, NNG has sufficiently demonstrated good cause to not provide notice. The primary concern is to ensure that the trade secrets that Shrimpton already stole are not further distributed. If notice is given, Shrimpton will likely copy and send the information somewhere else, further frustrating NNG's attempt to stop the misappropriation. For this reason and to maintain the status quo, NNG requests that the application for TRO be granted without notice. *See, e.g., Pepe v. Oceanview Factory Outlet Corp.*, 770 F. Supp. 754, 760-61, 21 U.S.P.Q.2d 1509, 1514 (D.P.R. 1991) (in such cases it is common for defendants "to simply ignore and violate the temporary restraining order by destroying or hiding the property in question and subsequently denying that it ever existed"); *Bacardi & Co., Ltd. v. New York Lighter Co., Inc.*, No. 97-CV-7140, 2000 U.S. Dist. LEXIS 19852 (E.D.N.Y. 2000) ("federal courts may properly issue an *ex parte* order of seizure under traditional rights and in application of a federal remedy for violation of state laws of unfair competition").

-11-

104784350_1

## CONCLUSION

For the foregoing reasons, NNG requests this Court enter the attached *Ex Parte* Application for Temporary Restraining Order. The Court should also schedule this matter for hearing on the motion for preliminary injunction. A proposed order has been submitted in accordance with Civil Local Rule 65-1.

Respectfully submitted,

Dated: April 12, 2019

By:   /s/ Michael J. McCue

MICHAEL J. MCCUE (SBN: 296425)
Email: MMcCue@LRRC.com
AARON D. JOHNSON (SBN: 261747)
Email: ADJohnson@LRRC.com
4300 Bohannon Drive, Suite 230
Menlo Park, California 94025
(650) 391-1380 (Tel.)
(650) 391-1395 (Fax)

*Attorneys for Plaintiff*
*NNG, Kft.*

-12-

104784350_1